KEENER *et al. v.* FINGER and KEENER, Admr's.

JOSEPH KEENER and others *v.* DANIEL FINGER and PETER KEENER, Adm'rs.

The Supreme Court has no jurisdiction under the Constitution, to consider the evidence and review the finding of the Court below, in regard to facts, as well as in regard to "legal inference," whether such issues of fact are tried by the Judge, or by a jury, or are made by the pleading, as under the old system, or are eliminated by the Court from complaint and answer, or by means of exceptions to a report.

That a defendant, an administrator, did not attempt to collect a debt for more than eighteen months after it fell due, does not warrant the legal inference of a want of due diligence on his part, without a finding of the further fact, that the obligors were men in failing circumstances, so as to call for active diligence in the collection, or that the condition of the estate required immediate collection, in order to pay off pressing demands and save costs.

Nor does it amount to a want of due diligence, that the defendant caused a levy to be held up for three years after judgment, and then directed the execution to one of the defendants therein, which was not kept up and perfected as a lien, unless it is also found that it was for the interest of the trust fund, that the debt should have been collected in 1863-'64, in Confederate money, or else that the circumstances were such that the defendant should have taken upon himself the odium of demanding specie, or that the defendant in the exercise of due diligence, should have foreseen the fact that at the close of the war, there was to be a military order forbidding the collection of old debts contracted for the purchase of slaves.

KEENER *et al. v.* FINGER and KEENER, Adm'rs.

(*Heileg* v. *Stokes*, 63 N. C. Rep. 612; *Klutz* v. *McKenzie*, 65 N. C. Rep. 102; *Hudgins* v. *White*, *Ibid*, 393; *Clegg* v. *N. Y. Soap Stone Co.*, 67 N. C. Rep. 302; *Foushee* v. *Thompson*, *Ib.* 453; *Powell* v. *Weith*, 68 N. C. Rep. cited and distinguished; and *Hill* v. *Kesler*, 63 N. C. Rep. 437 ; *McKeethan* v. *Terry*, 64 N. C. Rep. cited and approved.)

RODMAN, *J. dissentiente.*

CIVIL ACTION, tried before *Logan, J.,* (on exceptions to a report of the Clerk,) at Fall Term, 1873, of the Superior Court of LINCOLN county.

The plaintiffs, as next of kin and distributees of one Michael Keener, brings this suit against the defendants, his administrators, for an account and settlement. The complaint and answer are filed at Spring Term, 1870 ; at Fall Term, 1870, it is referred to the Clerk to take and account, who, after taking testimony, returns his report to Fall Term, 1871. At Spring Term, 1873, the plaintiffs file ten exceptions to the report of the Clerk, the second of which, being sustained by his Honor on the hearing, and being the only one considered in this Court, is fully stated in the opinion of the CHIEF JUSTICE.

Upon the exceptions filed, the Judge below, at Fall Term, 1873, gave the following judgment :

The whole matter being fully considered, &c., the Court doth find, as to the second exception of plaintiffs, the facts to be : 1st. That defendant did not attempt to collect the Baxter note until the Fall of 1862, more than eighteen months after it fell due. 2d. That the defendants, by their own orders and acts, caused a levy of execution not to be made until 1866, about three years after the judgment, and then the execution was directed to one of the defendants in the execution, and by him levied as set out in the record ; and then, not kept up and perfected as a lien on the lands of the defendants in the execution, so as to secure the debt ; and 3d. That the defendants, when they made the settlement of 27th September, 1863, accounted for the Baxter debt, and undertook to pay off all the distributees in Confederate money, in full, and retain the said note to themselves; and actually did pay off, tender, or file away Con-

federate money for said distributees to the full amount of the estate, the Baxter note included.

Wherefore, the Court doth declare, that the defendants have not used proper and due diligence in endeavoring to secure and collect the Baxter debt, and are chargeable with the amount of said debt and interest. The second exception is therefore sustained.

The Clerk will reform his report in accordance with this opinion, and report the amount due to each of the distributees of the estate, out of the sum charged to the administrators as above, to wit; the amount of the Baxter debt and interest being $2,175 and interest from 21st of February, 1861; and judgment is rendered against defendants therefor.

As the report will be modified and reformed, it is not necessary to pass upon the other exceptions of the plaintiff, except as to those of the plaintiffs who have not been paid in full, and those for whom defendants set aside Confederate money, as the report sets forth. As to these, the exceptions consistent with this opinion are sustained, and the others are overruled. The opinion of the Court is, that this Baxter fund shall be applied in the *pro rata* payment of the distributive share, which are unpaid, wholly or in part.

The defendants appealed from the foregoing judgment, for

1. His Honor erred in not overruling the exceptions.

2. He erred in holding that defendants were responsible for all the Baxter note.

3. In holding that defendants were responsible for any of it.

4. His Honor ruled erroneously on the facts found, and erred in the finding of the facts.

At the time at which the plaintiffs excepted to the report of the Clerk, they also demanded a trial by jury as to certain issues, one of which was to the degree and nature of the diligence used by defendants in collecting the said Baxter debt.

*Schenck,* for appellants, filed the following brief:

The Court erred in holding the defendants responsible for any part of the *Baxter note.*

This note was given at administrators sale, *for negroes,* and was due in 1861. The defendants placed it in the hands of the Hon. Wm. Lander for collection in February, 1862.

There was no negligence in not sueing on the note in 1861. No trial could be had on any debt during that year. See stay law No. 1, 11th May, 1861, acts 1st extra session 1861, p. 105; stay law No. 2, passed 11th September, 1861, after first stay law was declared unconstitutional, in *Barnes* v. *Barnes.* See acts of 1861, 1862, 1863, and 1864, p. 5.

If defendant had sued to Spring Term, 1862, he could not have obtained judgment until Fall Term, 1863, under these stay laws, as will be seen by examination, and at this term we obtained judgment.

Section 20 of the stay law No. 2 *extends the time for administrators to settle to four years,* showing that they were *not* expected to *collect;* the purpose of these laws being to prevent collections. See *Barnes* v. *Barnes;* *Jacobs* v. *Smallwood.*

No negligence for not collecting from 1863 to 1865, when the war closed. Nothing but Confederate money could have been collected, and administrator ought not to have taken that on a solvent ante-war note, when the next of kin were *refusing to receive it,* and it was so badly depreciated. *Gibbs* v. *Gibbs,* Phil. Law, p. 471; *Cumming* v. *Mebane,* 63 N. C., 317; *Keener* v. *Wallace,* 64 N. C., p. 189; *White* v. *Robeson,* 64 N. C., p. 698; *Covington* v. *Wall,* 67 N. C., 363; *Love* v. *Logan,* 69 N. C., p. 70.

In November, 1863, the County Court settled with the defendant, and included and charged the defendants with the Baxter note. Defendant then settled *in full* with eight or nine of the heirs, paying them *for their part* of the Baxter note, as chargeable in the settlement, and deposited Confederate money for the others, thereby trying to save the share for the heirs either in Confederate notes or in the Baxter judgment, whichever might survive the results of the war. The

deposits were lost, and if he had collected the Baxter judgment it would have been lost; the heirs would have gained nothing by collecting Confederate money in 1863–'64.

No negligence after the war:

Defendants levied the execution, which issued on the Baxter judgment, *on Baxter's land* who was *principal in the note on 17th August,* 1866, in pursuance of stay law 10th of March, 1866, sec. 3, acts 1865–'6, ch. 16, p. 22. No sale could then be made under that stay law.

The property was *sufficient.* The clerk finds in his report it was *sufficient* and the Judge does not overrule it and there is no appeal by plaintiff. So this is a *fact* in the case.

From August 1866 to 10*th April* 1867, when Gen. Sickles' Order No. 10 issued, the stay law prevented sale.

From 10*th April* 1867 to July 1869, Order No. 10 forbid *any action* on debts or *judgments for negroes. See the order in* 64 *N. C. p.* 104.

There was no sale " by order of D. Schenck, plaintiff's attorney," March 1869, the first *ven. ex.* after civil government was restored. This order was given because of the ruling in " *Mardre* v. *Fulton,* Phil Law 283." The levy had been suspended " a year and a day " by Gen. Sickles' order and notice was required to be given before sale, which Finger immediately issued and on its return got an order for sale.

Ths Baxter land was sold by the United States for taxes accrued *in* 1866, and sold in 1869 before we could sell legally. We sold as soon as we could but there being a conflict with the United States authorities it brought only a nominal price and Finger purchased it, and in his *answer* tenders it to plaintiff— he bought it to secure all he could.

Defendants followed all the parties in the judgment, sold their reversions, proved against bankrupts and did all he could to get the money.

It is submitted that certainly no *mala fides* is proven and none even alleged, and he has used more than ordinary dili-

gence. *Covington* v. *Leak*, 67 p. 363, *Kerns* v. *Wallace*, 64 N. C. p. 189.

But it is said he was guilty of gross negligence because his executions were issued to Lawrence, Sheriff, who was a defendant in the execution.

It is submitted that Mr. Finger, not being a lawyer himself, was bound to rely on his counsel for the collection and to see that the writs were in proper form and cannot be held responsible for the error or mistake of his attorney. *Deberny* v. *Ivey*, 2 Jones, Eq., 375.

No advantage was ever taken of this by the defendants in the judgment, nor does it appear that the debt was lost thereby, but the whole testimony shows it was lost by the results of the war.

His Honor erred in charging us with *all* the Baxter judgment. We had in Nov. 1863, when the settlement was made, accounted in full to *eleven heirs*, including their part of the Baxter judgment, and in any event only those who did not receive their parts of it can now receive said parts, which would be about seven-elevenths of it. But we cannot see under the liberal and benignant rulings of this Court, how this defendant who has honestly tried to do his duty, can be crushed by holding him for this note.

*McCorkle & Bailey*, contra.

1. Baxter note. Given by Baxter, Homerly, Falls, Lawrence and Stamey 21st August, 1860, and due 21*st February* 1861.

It is the duty of administrator to collect when due. The note was due 21st February, 1861, but no effort to collect was made till Fall, 1862, *over eighteen months* after note fell due. This is the *first* negligence.

2. Judgment was obtained 3d November, 1863, and execution issued by clerk, returnable to December Term, 1863, when the *plaintiff* ordered it *not to be collected*. *Second* negligence.

3. Next execution to May 1864, when it is returned "not collected by order of plaintiff." *Third* negligence.

4. Next execution to January 1865, and return "not collected by order of plaintiff." *Fourth* negligence.

5. Next execution to May 1866, when the return is, "levied on 144 acres by consent of Baxter," and this by the *sheriff* who was a *defendant* in the execution.

It appears from the record filed, that all the above executions were issued to *Lincoln* and to the sheriff who was a *defendant* in execution and who had *no right to levy* on his own land or to *act at all* on an execution against him and others jointly. *This is inexcusable* negligence and even seems fraudulent. *Bowen* v. *Jones*, 13 Ired. 25.

6. *No execution* issued to Cleveland at all, where Homerly and Falls resided and had large estates and were entirely solvent to 1869. *Fifth* negligence.

7. From 1866, May, to 1869—three years. *No execution or ven. ex.* issued at all, and in 1869, a *ven. ex.* issued and a *fi. fa.* which was levied by King, the new sheriff, and the first one authorised to levy at all, upon 118 acres of land belonging to the old sheriff, Lawrence, and the land of Jos. Stamey, and no sale *by order of plaintiff's attorney.* Homestead law was passed now and the levy was too late, and both took shelter behind it. *Sixth* negligence.

It being well settled that a defendant in an execution cannot act upon it when issued to him, and in fact is void and of no efficacy whatever, it follows that no legal execution was issued and no legal levy made till King made it in 1869, *six years* after judgment, and in the meantime all the defendants fail. It was the duty of the plaintiff to issue execution to the *coroner*, as the law prescribes. 1 Hay. 422, (487;) Bat. Dig. 1,088 ; *Collins* v. *McLeod*, 8 Ired. 221 ; Rev. Code, chap. 31, sec. 55. Sheriffs only to execute process legally issued to them. *Seventh* negligence.

8. Gen. Sickles' order issued 11th of April, 1867, *four* years after the judgment, and therefore has no application

here, and no stay law forbids a levy, and they have no applica-
tion.   See General Order No. 10, 64 N. C. Rep. 104; Stay
laws, 1861, '62, '63, '64, '65, '66.

9. The evidence shows that the defendants regarded and
treated the Baxter note as *cash,* and they accordingly paid to
several of the distributees their *pro rata* share of this debt.

10. But the evidence discloses the purposes of defendants in
*not* collecting the Baxter note.   Finger testifies that he, the
defendant Finger, proposed to pay David Shrum and Margaret
Carpenter, or go in and pay off the lien in Confederate money,
and hold the Baxter note.

In May 1870, the Baxter land was sold by the sheriff and
David Finger, the defendant, purchased at $15.00.   So what-
ever interest was levied on is now in the defendant; if it is
worth the debt he has it and is safe; if it is not, as we allege,
then he is guilty of negligence in not turning enough property
levied on to make the debt secure and in not keeping up the
lien after it was created.   Shall the plaintiffs take $15.00 in
lieu of the Baxter judgment?   The defendant has not con-
veyed or offered to convey to the plaintiffs the Baxter land so
purchased, even if they could take it and a good title be made.
Defendant had it levied on for the debt and has sold it for the
debt and now owns it for the debt.   By his negligence he
made it his own and is chargable under that debt.

PEARSON, C. J.   On the facts found by his Honor, we do
not concur in the legal inference, " That the defendants have
not used proper and due diligence in endeavoring to receive
and collect the "Baxter debt," and are chargeable with the
amount of said debt and interest."   The case was made up
and argued before us on the assumption that this Court had
jurisdiction,—upon exceptions filed to an account, to go into
all of the evidence and review his Honor's finding in regard
to the facts, as well as in regard to legal inferences.   We are
of opinion that the Constitution does not confer such jurisdic-
tion upon this Court; on the contrary, we are of opinion that

it is expressly prohibited.   In *Heilig* v. *Stokes*, 63 N. C. Rep. 612, a distinction is taken between "questions of fact" on a a motion for an injunction and "issues of fact," which are conclusive of the case.   In *Klutz* v. *McKenzie*, 65 N. C. 102, it is decided, that upon exceptions to the report of a referee, stating an account, this Court cannot review the finding in the Court below upon the "issues of fact" made by the exceptions.   In *Clegg* v. *N. Y. Soapstone Company*, 67 N. C. Rep. 302, it is decided, that upon a motion to vacate a judgment this Court cannot review the finding of his Honor in the Court below upon the facts.   So in *Powell* v. *Weith*, 68 N. C. Rep. 342, *Hudgins* v. *White*, 65 N. C. 393.   We consider this matter settled by the plain words of the Constitution : " The Supreme Court shall have jurisdiction to review upon appeal any decision of the Courts below upon any matter of law or legal inference, *but no issue of fact shall be tried before this Court.   Art. IV. Sec.* 11."   In *Foushee* v. *Thompson*, 67 N. C. Rep. 453, Justice RODMAN makes the suggestion, that to allow the finding of the Judge below as to issues of fact, to be conclusive, and not to be the subject of review, confers upon one man a vast and dangerous power.   That may be so, and perhaps the danger is guarded against by another clause in the Constitution which, by plain implication, gives to either party the right to have all issues of fact tried by a jury : " In all issues of fact joined in any Court the parties may waive *the right* to have the same determined by a jury, in which case the finding of the Judge upon the facts shall have the force and effect of a verdict of a jury."   *Art. IV. Sec.* 18.   If "issues of fact" made by exceptions to the report of a referee, in stating an account, and the finding of the Judge thereon cannot be reviewed in this Court, which we consider settled, it would seem that such issues, when eliminated by an exception to the report, may be tried by a jury, unless the parties waive the right to have the issue tried by a jury.   The remarks made by me in *Klutz* v. *McKenzie*, as to the objections to a jury trial, in the old " action of account," and my intima-

tion that the parties were not entitled to a trial by jury, were made on consideration of *C. C. P.*, and without advertence to the power of the Constitution, *Art. IV. Sec.* 18, and it stands as an open question. But, however this may be, the words of the Constitution are too plain to admit of discussion or to be refined away by construction. It is ours to interpret the law, not to make it. The manifest purpose of the Constitution is to take from the Supreme Court, as constituted under the new system, the jurisdiction which it had under the old order of things, to try all equity cases, both law and fact, upon appeal or by transfer from the Superior Courts. Whether the issues of fact are tried by the Judge in the Court below, or by the jury, this Court is expressly prohibited from trying issues of fact, whether made by the pleadings as at law under the old system of pleading, or eliminated from the complaint and answer, by the Court directly, or by means of exceptions to an account, as at equity, under the old system of equity procedure. Taking this to be settled, we confine ourselves to the facts found by his Honor and to his legal inference therefrom, and do not feel at liberty to look into the evidence, which, without answering any useful purpose, encumbers the papers in this case, and will add a large amount of unnecessary costs.

His Honor finds the facts to be : 1st. "That the defendants did not attempt to collect the Baxter note until the Fall of 1862, more than eighteen months after it fell due." Taking this to be so, it does not warrant the legal inference of a want of due diligence on the part of the defendants, without a finding of the further fact, that the obligors were men in failing circumstances, so as to call for active diligence in the collection, or that the condition of the estate required an immediate collection of this note in order to pay off pressing demands and to save costs." 2d. " That the defendants, by their own orders and acts, caused a levy of execution, not to be made until 1866, about three years after judgment, and then the execution was directed to one of the defendants in the execution, and by him as *set* forth in the record hereto annexed, and then not kept

up and perfected as a lien on the lands of defendants in the execution, so as to secure the debt." Taking all this to be so, it does not warrant the legal inference of a want of due diligence, without a finding of the further fact, that it was for the interest of the trust fund that it should in 1863 and 1864, have been collected in Confederate money, or else the defendants should have taken upon themselves the odium of attempting to collect the debt in specie ; and the further fact, that the defendants, in the exercise of due diligence, should have foreseen the fact, that at the close of the war, there was to be a military order forbidding the collection of all debts contracted for the purchase of slaves; and of the further fact, under the construction given to the homestead law, it would be held to apply to pre-existing debts, as in *Hill* v. *Kesler,* 63 N. C. Rep. 437, and that such significance would be given to the fact of a *levy on land,* as in *McKethan* v. *Terry,* 64 N. C. Rep. 25. 3d. "That the defendants, when they made the settlement, 27th September, 1863, accounted for the Baxter debt, and undertook to pay off all of the distributees in Confederate money in full and retain the said note themselves, and actually did pay off, tender, or file away Confederate money, for said distributees to the full amount of the estate, the Baxter note included."

·' Whereupon the Court declares that the defendants have not used proper and due diligence in endeavoring to secure and collect the Baxter debt, and are chargeable with the amount of the said debt and interest."

This third fact, as it seems to us, instead of tending to show a want of due diligence, tends to show the contrary, for if the defendants designed to make the Baxter note their own, by settling up the estate in Confederate money and holding back this note for themselves, that relieves them from the implication of a want of diligence in its collection, as it is to be supposed they would use due diligence in collecting a note which they believed had become their own ; although it may subject them to the imputation of an attempt fraudulently to convert to their own use a note belonging to the estate.

So his Honor missed the point, and instead of the legal infe. rence of a want of due diligence, he should have considered whether the facts warranted the legal inference of fraud, and then he would have been led to the consideration of the ques- tion, can a *cestui que trust*, who seeks to follow the fund, hold the trustee liable when he has made no profit, and the fund has been lost notwithstanding due diligence on his part to pursue it? If so, a Court of Equity will impose *a penalty*, for which we find no precedent in the books.

For this finding of his Honor does not warrant the legal inference of a want of due diligence, and the defendants have made no profits.

The decision is reversed, and the case remanded, to the end that the facts may be more fully found, because his Honor seems under a misapprehension of the power of this Court to look into the testimony and supply matters of fact, material to his legal inference;—to have merely found the prominent facts, as he considered them. In the Court below, if the par- ties be so advised, the right of a trial by jury as to the issue of due diligence may be demanded, so as to present that question to this Court directly for adjudication.

This will be certified.

Per Curiam.                    Judgment reversed.

Rodman, J., (*dissenting.*) I dissent from so much of the opinion of the Court in this case as decides that this Court has no right to review the opinion of the Judge below upon a question of fact made by the exceptions to the report. As I consider the question important I hope I shall be excused for an unusual prolixity.

The Constitution, art. IV, sec. 10, is as follows :

" Section 10. The Supreme Court shall have jurisdiction to review upon appeal any decision of the Court below, upon any matter of law or legal inference; *but no issue of fact* shall be tried before this Court, and the Court shall have power to issue

any remedial writs necessary to give it *a general supervision and control* of the inferior Courts."

The particular question presented in the present case is this: A reference is made to a commissioner to report an account and he accordingly makes a report in which he finds a certain fact. One of the parties excepts to the report, for that the finding in respect to that fact is not supported by, or is contrary to the evidence, and that the commissioner ought, upon the evidence, to have found the other way. I agree with the rest of the Court that the Judge *may* make up an issue between the parties as to the disputed fact and submit the issue to a jury. And I also agree that he is not bound to do so, but may decide it himself. Can his decision be reviewed on appeal to this Court, or is it final? In one sense of the word, it is an issue of fact, for one party affirms a fact and the other denies it. But is it such an issue of fact as the Constitution prohibits from being reviewed on appeal in this Court? I think it is not. I think that in the Constitution, the phrase was intended to include only such issues of fact *as are made by the pleadings.*

The reasons which I shall offer in support of my opinion may be classed under three heads:

1. Authorities prior to the Constitution, showing the established meaning of the phrase then, and reasons for believing that it was used in that well understood and familiar sense.

2. Authorities since the Constitution defining its meaning.

3. The great public inconvenience to result from giving to it any other meaning; raising a presumption that this, and no other, was intended in the Constitution.

1. It is a settled rule that in the construction of all legal enactments, that when technical terms are used, they must be understood in the sense in which they are commonly used and understood by and among persons conversant with the art or science to which they belong. This rule has been repeatedly admitted as applicable in the construction of the Constitution of the United States.

I maintain that the phrase "issue of fact," as commonly used in Acts of Assembly, treaties on pleadings, and other law books, and among lawyers, has a well understood meaning which confines it, when accurately and technically used, to issues made by the pleadings

It is trite learning, that in actions at common law, the rules of pleading were so framed as to compel the parties by their respective allegations and denials finally to come to some single, certain and material fact, alleged on one side and denied on the other. Then the parties were said to be at issue, and the question so raised was called an issue of fact. It was called "an issue" because it was the "*exitus*" or end of the pleadings. At common law but a single plea was allowed and there could be but a single issue. Afterwards, by statute of Anne several pleas were permitted and consequently the issues might be proportionately more numerous. But this change is not material for the present purpose. There may be issues of law also, made in like manner, but as such issues have no bearing in the present discussion I omit to notice them.

I think it will not be seriously denied, that, as applied to actions at law, such is the primary meaning of the phrase; and its only meaning, when accurately and technically used; and also its most usual meaning. No questions of fact otherwise made than by the pleadings, and which arose incidentally in the course of an action, were called issues. The following authorities, which space will not permit me to quote at length, fully support this view : 3 Bl. Com., chap. 20 ; Steph. Pl., 24, 54, 124, 444 ; Tomlins Law Dict., title, Issue ; Rev. Code, ch. 31, sec. 57, rule 13. One passage only I will quote from Blackstone : "Issue, *exitus,* being the end *of the pleadings,*" &c. 3 Com. ch. 21, p. 314. No uncertainty as to the meaning of the phrase occurs until we apply it to questions which arise in suits in equity, upon the pleadings, or otherwise. But any meaning which it may have in proceedings in equity, is not a primary, but a secondary one, and the phrase is applied by analogy only. In early times it was never so applied ; the

term was unknown in such proceedings. In suits in equity the rules of pleading at common law did not apply. The plaintiff stated the facts of his case *at large*, as did the defendant his defence. Of course, in such statements there was much that was vague and immaterial, and the duty necessarily fell on the Judge, of either formally or informally striking out the immaterial allegations and ascertaining what material fact was alleged on one side and denied on the other. The question so ascertained was called by the civilians, who alone sat, or pleaded in those courts, *litis contestatio.* Steph. Pl., *ante.* After a while, the two systems of common law and chancery began to influence each other; the pleaders in the courts of one attended the courts of the other; and the Chancellor occasionally sent such questions as he had educed to be tried by juries in the courts of common law; then the word "issue" was imported from the common law courts into the Courts of Chancery, where it had been hitherto unknown, and applied by analogy to what had been called the "*litis contestationes.*" Being applied upon an analogy only, the application was naturally less precise and more general, and it sometimes extended to every question of fact which a Chancellor might think proper to submit to a jury, no matter in what way or at what stage of the suit it arose. But, still, even in Courts of Chancery, its usual meaning was, and is, an issue made out of the pleadings.

The Constitution, itself, furnishes conclusive evidence that the phrase was used in its primary, common law sense. The clause which abolishes the difference in the forms of actions at law and in equity, (art. 4, sec. 1,) was copied from the law of New York, and the code of practice and procedure, which commissioners were appointed to frame, was evidently contemplated, should be substantially similar to the one long in use in that State. This code of New York, (which in this respect has been almost literally copied in our own,) enacts rules of pleading which *essentially*, and in all the respects in which the common law system is distinguished from the chancery

4

system of ascertaining the issue, are those of the common law. This may be seen by comparing the rules of the code with those given by Stephen. By these the parties are, or may be, compelled to come to one or more issues decisive of the case. And although, no doubt, in practice it often happens that this desirable result is not attained, it is from negligence in the pleaders, and indulgence in the courts, and not from anything in the rules designed to produce such an abortive result. The phrase was used in anticipation of the conversion of all actions and suits substantially into actions at law, and must have the meaning which it had as applied in such actions.

A consideration of the evil designed to be remedied by this provision in the Constitution, will also help us to the meaning of the words by which it was attempted to be done. The evil was this: This Court had been in the habit of trying issues of fact in equity suits, both upon appeal and originally. This was certainly contrary to the spirit of the Bill of Rights, and to the sentiment that no court should pass both originally and finally upon such issues, but that they should in all cases be submitted to a jury as the most appropriate triers of fact. To conclude, that because it was deemed imprudent to entrust the trial of facts to three men who were required to publish the reasons of their decision for public criticism, therefore, the Constitution gives this power to one man, sitting in a Superior Court, without appeal or responsibility, and not required to give, much less to publish, any reasons whatever, seems to me very much like supposing that the Constitution meant to cure a mild disease by administering a deadly poison. The remedy really adopted was to require all *issues* to be tried by a jury, and therefore to forbid their trial in this Court which has no jury.

I pass now to the second class of reasons:

2. In *Heileg* v. *Stokes*, 63 N. C., 612, (June Term, 1869,) the Judge below had refused to vacate an injunction, and the defendant appealed. The propriety of his refusal depended on facts which were disputed. It was contended by the plaintiff

that this Court could not review the judgment below, because the doing so required the trial of an issue of fact. This Court held that it had the right, and took the distinction which I now insist on, between questions of fact arising incidentally or otherwise than on the pleadings, and issues of fact joined on the pleadings. This decision has met the continued approval of the profession, and has been repeatedly acted on by this Court. It is clear, either that the phrase has the limited meaning which I attribute to it, or this decision was erroneous. Either the phrase is so limited or *all* questions of fact whatever, no matter when or how made, are "issues of fact," in the constitutional sense, and this Court cannot review the findings of the Judge below in any case. And if the construction were consistently carried out, it would forbid this Court from finding *any* fact, either originally or on appeal. For the law is, that we shall try no issues of fact, without any exception. The Court could not punish contemptuous conduct, even in its presence, because it would require the finding of a fact. Yet it had no scruples, and thought of no such construction in *ex parte Moore*, 63 N. C., 397, where it found as a fact that certain persons had signed and published a certain writing. It would also forbid the Court from hearing any affidavit on a motion for a *certiorari*, or to amend its own records or to refer any question to its Clerk, which, nevertheless, it constantly and properly does. If we abandon the line of distinction which I draw, and hold all questions of fact to be issues of fact, in the sense of the Constitution, the Court can try none of them. For when the Constitution prescribes a law, it cannot be observed or not, as may be convenient, and where that classes all questions as issues of fact the Court can make no discrimination.

Again I do not know how the Court will decide upon the question, whether a party has a right to a trial by jury of a question of fact arising upon an an exception to a report. I am of opinion that he has not, because of the great inconvenience of such a course. But if I thought the exception raised an

" issue of fact," in the sense of the Constitution, I should think otherwise. For a trial by jury, of issues of fact joined on the pleadings, has always been held guaranteed by sec. 19 of the Bill of Rights, and is given, (unless where it is waived by the party) by the strongest implication, by sec. 18, art. iv, of the Constitution, and by sec. 266, of C. C. P. If questions of facts made by exceptions, are not issues, so as to entitle a party to trial by jury, they cannot be issues, to exclude a review of a Judge's finding by this Court. Again in numerous cases this Court has referred it to its clerk to find facts, which findings if approved must be taken to be the findings of the Court, as the clerk has no judicial power.

In *Greenlee* v. *Sudderth,* 65 N. C. 470, it was referred to the clerk to find the premium on gold. In *Boyden* v. *Bank of Cape Fear,* not reported on that point, to find whether certain checks had been drawn. In nearly every case brought against the State, the clerk has been directed to find and report the facts. In *Whitford* v. *Foy,* to state a guardian account; and there are many other instances of a similar practice, which I think proper, but which are inconsistent with the doctrine that all these are issues of fact, and which if that be the doctrine, cannot be justified.

3. The Constitution art. iv, sec. 28 says : "The Superior shall be *at all times* open for the transaction of all business within their jurisdiction, except the trial of issues of fact requiring a jury." In *McAdoo* v. *Benbow,* 63 N. C. 461, this Court held that an act of Assembly, which closed the doors of these courts, to a large part of the business within their jurisdiction for all but four weeks in the year, was not repugnant to this clause. I do not mean to question that decision. I consider it *res adjudicata.* But some observations are necessary in order that I may extract from it the principle on which it was decided. Every decision should stand on some recognized principle of law more or less general. To admit that any one does not, is to admit that it stands on no principle, and is arbitrary and wrong. It must be conceded that the decision cited did

some *apparent* violence to the language of the Constitution. It may be only a gentle violence. " *Molliter manus imposuit.*" Now, on what principle was the violence justified and the case decided? I humbly conceive on this. If a literal or strict construction of a clause in any statute will work a great public inconvenience, even if the language be plain, a court is justified on that ground, " *in salutem rei-publicæ,*" to give it a construction which will avoid the inconvenience. It was argued indeed, in that case, that an observance of the clause was physically impossible, because the Judge could not be in court all night and on Sundays. But this difficulty was purely imaginary, since evidently the legal construction was, that the court should be open at all *reasonable* times. Again, it was said, that *the court* could not always be open, because *the Judge* was required to hold courts in several counties, and could not be in any one all the time. But this is an evident fallacy, for the *Judge* is not required to be in court all the time, he being but one member of the court, and all the business to be done, in his absence, being that which the clerk had original jurisdiction to do. So there was in fact no physical impossibilty, and the reason must have been what I have assigned. This principle goes to the verge of judicial power, and touches the borders of the " higher law;" but I think within proper limits, it may be maintained, and it is affirmed by the case cited. I do not think it necessary to call in the aid of this principle to sustain my present views. But, when we consider the great public inconvenience, to say the least, which will follow from the construction now proposed. I think if there was ever a case in which the principle of *McAdoo* v. *Benbow*, ought to weigh, it is this.

This construction gives to a Superior Court Judge not only the original, but the final and irresponsible finding of a large class of facts, it may be of a most complicated character, and involving great values. His finding is subject to no review, it is made upon a hearing which can scarcely be called public, in the hurry and confusion of term time. He gives no reasons;

the finding itself may be unknown except to the parties. Except in a case of gross and provable corruption, the irresponsibility could not be more complete. No Judge out of North Carolina, at least none in the United States or in England, has ever possessed such a power. It is at least liable to abuse, and is certain to be attended with occasional errors, which nevertheless, however patent, cannot be corrected. I think this court needlessly strips itself of a very important power which the Constitution intended to give it. I may be asked, if the Judges of the Superior Courts should not have this power, are we any more fit to have it than they? Certainly it would be indecent and without a reason to claim for the Judges of this Court any greater uprightness or wisdom than I concede to those of the Superior Courts. But the power which I think belongs to this Court, is not that which I deny to the Superior Court Judges, but a different one. It is not to find originally and finally, but only finally on review, a power which must be lodged somewhere. And I do think, that with the advantages which this Court has, in its numbers as insuring full discussion and patient deliberation, and with the original finding of the Judge with or without his reasons, it will often be able to detect errors which escaped him, and which upon a second examination, are obvious enough.

When I claim for this Court the power to review on appeal the findings of the Judge, I do not understand it will be usually, if ever, necessary to balance the credibility of witnesses, or to inquire anew into the primary facts and subordinate facts, from which the general or ultimate conclusion of fact, is inferred. Almost always the general facts which the Judge finds, and to which the principles of law are to be applied, are inferences from other facts or circumstances in evidence. The Judge may mistake the bearing or weight of these upon the general conclusion. Although the process by which he arrives at his conclusion, is a reasoning from one or several facts, to a more general one, and is not a finding of the law, or a legal

inference from facts, yet it partakes of the nature of it, and is equally susceptible of, and proper for, review.

I believe the practice of all courts out of this State, conforms to this view.