[No. 7730.]

## BAILEY v. THE PEOPLE.

1. CRIMINAL LAW—*Homicide—Self-Defense—Right to Act on Appearances*—Where to an information for murder the defense is that the prisoner acted in defense of his household against serious bodily injury threatened by the deceased, the jury are to take into consideration, what, under the circumstances, the prisoner might have reasonable cause to believe as to the intentions of the deceased. An instruction to the effect that in order that the doctrine of self-defense should apply, the jury must believe that deceased intended to assault or kill the inmates of the house, is error, as a denial of the right of self-defense as defined in the statute (Rev. Stat., sec. 1632).

2. ———*Evidence—Information for Murder*—Deceased was the husband of a sister of the prisoner. The homicide was committed while deceased was attempting to forcibly enter the house of the prisoner where the wife had taken refuge, and was refusing to return to him. Evidence of acts of brutality committed by deceased upon the person of his wife, that these had been made known to the prisoner, that the wife had fled to the house of prisoner for protection, that deceased had made threats to take the life of both the wife and the prisoner, and that the general reputation of deceased was that of a quarrelsome and dangerous man, is admissible to show the state of mind of the prisoner, and the apprehensions which he might reasonably entertain as to the designs of the deceased.

3. ———*Duty of Prosecutor*—Information for wilful murder. Deceased was the husband of sister of prisoner. She had taken refuge from the husband's brutalities at the house of the prisoner where her mother was also residing. The homicide was committed while the deceased was attempting to force himself into the house of the prisoner in order to coerce the wife to return to him. The prosecutor was permitted to propound questions which, by innuendo, tended to reflect upon the moral character of defendant's house, and those who resided there. There was no evidence justifying these insinuations. The conduct of the prosecutor was declared reprehensible. "It is the duty of all counsel to repudiate all appeals to unworthy prejudice, and this is eminently so in the case of one who prosecutes for the people.

4. ———*Poor Person—Consideration Due To*—The prosecutor is bound to see to it that no unworthy advantage is taken of the accused, and this is especially so where accused is a poor person, and defends by appointed counsel.

5. HOUSE—*Right of Householder to Defend*—A householder may repel by force one who seeks to forcibly enter his dwelling; and if the

conduct, words, and known character of the assailant are such as to excite in the mind of a reasonable person the belief that his purpose is to kill or do great bodily harm to some person within the house, the householder is justified in carrying his defense, even to the taking of life.

6. HUSBAND AND WIFE—*Right of Husband to Control Wife's Person*—The husband is not entitled to enter the house and premises of another, against the will of the householder, for the purpose of conferring with his wife, and persuade her to return to him; much less may he use force to compel such return.

*Error to Denver District Court.*—Hon. GEORGE W. ALLEN, Judge.

Mr. T. J. O'DONNELL, Mr. J. W. GRAHAM, Mr. CANTON O'DONNELL, and Mr. WILLIS STIDGER, for plaintiff in error.

Mr. JUSTICE SCOTT delivered the opinion of the court:

Joseph E. Bailey, defendant in error, was convicted in the district court of the city and county of Denver, on the charge of the murder of Eugene H. Smith. The verdict was that of murder in the first degree. The wife of Smith was a sister of the defendant Bailey. The homicide occurred on the 18th day of July, 1910. It appears that because of a quarrel between Smith and his wife, and of the violent beating and abuse of her by Smith on the 15th day of July, the wife with her two children, left home and took refuge with her mother at the house where the defendant and his wife resided. This seems to have been but one of many similar occurrences.

At about ten o'clock on the evening of the 18th, Smith called over the telephone demanding that he be permitted to talk with his wife, which was refused by the mother who answered the telephone, whereupon Smith replied with vile and abusive language, which caused the mother to hang up the receiver. About fifteen minutes after this, Mrs. Smith's little boy, by a former marriage, who was in the yard for the purpose of sleeping there, and who had heard his grandmother

talk over the telephone, came running into the house and shouted to his mother that he, meaning Smith, was coming. It seems that all of the occupants of the house had at this time retired, or were in the act of retiring. Upon hearing the boy's cry, Mrs. Smith ran into the bedroom occupied by the defendant and his wife, and called to him.

Mrs. Smith's testimony upon this point is in substance as follows:

"I looked out of the window, looked northward; I was undressed to go to bed; he was under the arc lights. He was almost running. He was just plunging, just coming in a jump like that, (indicating). It frightened me so; I could see from his appearance that he was in a very angry, bad mood, and I ran to my brother's bedroom door and called to him that there he came. I said to my brother: 'Get up out of bed, yes, there he comes,' and I said, 'For God's sake, don't let him come in here; if you do he will kill the whole family—he will kill mother and me.'"

The defendant thereupon arose from his bed, secured a revolver and called out to Smith through the window, demanding that he should not come into the yard. He then went from his bedroom into a room from which a door opened upon a porch, and upon which Smith was entering. The defendant called to Smith, it appears four times, and demanded that he should not come in. In reply to either the first or second request Smith said, "I will come in and get the whole God damned push of you."

Smith finally opened the screen door as if coming in, when the defendant said, "I tell you for God's sake don't try to enter this side porch or the house; if you do I will shoot you." About this time the defendant fired the shot that resulted in the death of Smith. The defendant was crippled in his right hand from an injury recently sustained, and was compelled to use the revolver with his left hand. Smith was a very large and powerful man, much larger than the defendant.

It appears that earlier in the day R. L. McDonald, a brother-in-law, at the request of Mrs. Smith, went to Smith to see if an adjustment of their trouble could not be had, and at which time Smith said, "Well, if she will come back and live with me and do just as I say, I will live with her, and if she won't, God damn her, I will kill her."

A witness named Tyler, who was at the time living at the house of the Smiths', also testified that, "On the morning of the shooting, Smith showed me a gun and said, 'It was a God damn good thing you got me drunk last night, or I would have gone down and cleaned out the whole God damn push.' Smith came home on the morning of the 18th of July (the day of the shooting) about two o'clock. He had been drinking. He came into my room and raised a fuss with me; struck me and used—(the witness repeats vile language of deceased toward him). I had a thirty-eight revolver under my pillow; I drawed the gun on him and stood back on the opposite side of the bed until I could get down the stairway, and when I got down the stairway, I got out and stayed out the rest of the night. Mrs. Smith wasn't there; just I and Smith."

There are many assignments of error, but in as much as the case must be reversed by reason of certain prejudicial instructions given, it will not be necessary to consider other assignments.

The court over the objection of the defendant, gave instructions Nos. 10 and 21, which are so clearly erroneous and prejudicial to the rights of the defendant, and are so closely connected in their subject matter as to make it convenient to consider them together. These in full are as follows:

"No. 10. That if you believe from the evidence, that the deceased, Eugene H. Smith, attempted to enter the house of Joseph E. Bailey or his mother, wherein he resided, and that at the time he attempted to enter the same he feloniously intended to assault or kill any of the inmates thereof, then you are instructed that the doctrine that every man's house is

his own castle, would apply, and the defendant Joseph E. Bailey is not required under the law to retreat from the position or stand which he had taken; but upon the other hand, if you believe that the said Smith attempted to enter the said house for the purpose of conversing with and inducing his wife to leave the said house, or for the purpose of using physical force, in endeavoring to do so, and had no intention of injuring or attempting to injure any of the inmates of the said house further than to exercise a reasonable supervision and control over his wife and her conduct, then you are instructed that there is no self-defense in this case, and no justifiable killing, and the said Joseph Bailey's killing of the deceased was unlawful, unless you believe from the evidence, that the circumstances attending the entry into the house was of such a character as would lead a reasonable man under like circumstances to believe that he or the inmates of the said house were about to receive great bodily injury."

"No. 21.   The court instructs the jury:   That the deceased, Eugene H. Smith, as the husband of the sister of the defendant, Joseph E. Bailey, had a right to exercise such reasonable control over her as was necessary to conduce to the proper establishment and maintenance of his household as the head of a family; and as such husband had a right to enter, in a lawful manner, the house or houses of any person whomsoever, for the purpose of talking with and procuring his said wife to leave the said house, if he so desired, and had a right to use such reasonable force and persuasion as was necessary to induce her to leave the house of her mother and come back to her home with him; and no person, not even her brother, Joseph E. Bailey, had a right to interfere with him in the exercise of such reasonable force or persuasion; and if you believe from the evidence, beyond a reasonable doubt, that the deceased, Eugene H. Smith, left his home on the evening of July 18th, and after telephoning to the house of Mrs. Bailey, went there for the purpose of seeing his wife and talking with her and endeavoring to persuade and induce

her to leave the house of the said Mrs. Bailey, her mother, or to talk over their family affairs and difficulties, and that he had no intention to inflict bodily harm or injury upon the persons in said house, then you are instructed that there is no self-defense in this case and no justification for the killing of the said Eugene H. Smith by the said Joseph E. Bailey."

These instructions not only announce such palpable misstatement of the law as to prejudice the rights of the defendant, but go to the extent of proclaiming a doctrine concerning the relation of husband and wife as to appear nothing less than monstrous at this period of our civilization.

The jury are here told that in order that the doctrine of self-defense may apply, they must believe from the evidence that Smith attempted to enter the house of defendant, and also that at that time he feloniously intended to assault or kill any of the inmates. This is not the law. It is not the state of the mind of the defendant alone which the jury are to consider, but of the deceased as well. That is to say, what the defendant believed, or what under all the circumstances he might have reasonable cause to believe to be the intention of the defendant.

These instructions are the equivalent of a denial of the very right of self-defense as defined and provided by our statutes. Sec. 1632, Revised Statutes, 1908, provides:

"Justifiable homicide is the killing of a human being in necessary self-defense or in the defense of habitation, property or person against one who manifestly intends or endeavors by violence or surprise to commit a known felony, such as murder, rape, robbery, burglary and the like, upon either person or property, or against any person or persons who manifestly intend and endeavor in a violent, riotous or tumultous manner to enter the habitation of another for the purpose of assaulting or offering personal violence to any person, dwelling or being therein."

The evidence clearly justified the submission to the jury of the question as to whether or not the deceased was a per-

son who manifestly intended and endeavored in a violent, riotous or tumultous manner to enter the habitation of the defendant for the purpose of assaulting or offering personal violence to any person dwelling or being therein.

Instruction No. 21, without qualification, declares in substance that a husband without warrant of authority, and over the protest of the occupant has a right to enter the house or houses of any person whomsoever, for the purpose of talking with, and procuring his wife, and against her will, to leave such house if he so desires.

This is not now and never was the law in this country. It is a repudiation of every reasonable conception of the law of domicile and the right of habitation. Neither a husband nor any other person has such right. It strikes at the very foundation and sanctity of home life. It gives license to every drunken vagabond or other evil person, to invade the privacy of every man's home. It would destroy the moral, constitutional, statutory and common law right of defense of habitation.

It is true the instruction declares the entrance must be in a lawful manner. But there can be no such thing as lawful entrance under such circumstances.

But the part of the paragraph of the instruction following, is even more shocking. Here the jury are told that a husband may over the protest of the occupant of the house, and over the protest of the wife of the husband so entering, not only enter any man's house, but has a right also to use such reasonable force and persuasion as may be necessary to cause the wife to leave the house of *his* mother and come back to his home with him, and that no person, not even her brother has a right to interfere with him in the exercise of such reasonable force or persuasion.

The use of the word "force" in connection with the word persuasion can refer to physical force only, and the exent of this force is thus limited only by the necessity of the case, in order to so secure the possession, control and abduction of

the person of the wife, and all this as against her will, her fear, and even the apparent danger of her life.

In other words, if this be the law, whatever may be the circumstances, the defendant was absolutely without right to defend his home and his near relatives from the threatened assaults and brutality of an infuriated and drunken husband, at whose will the home is to be made the place of riot and the occupants to suffer mental distress, probable assault, and as indicated by the testimony in this case, possible murder.

Such is not and can never be the law in a civilized country.

This assertion of the right of a husband to control the acts and will of his wife by physical force cannot be tolerated.

The prejudicial effect on the defendant's rights by these instructions is too palpable to require comment.

Counsel for defendant in their very excellent brief have cited many cases bearing upon this question. Among these is that of the English case of *Queen v. Jackson*, Div. 1, 1891. This was a case where a husband undertook to restrain the liberty of his wife by forcibly keeping her in his own home after she had declined to further live with him. The decision of the court in that case may be epitomized in the statement of Mr. Helmer Collins, Q. C., as follows:

"The contention of the husband would result in the re-introduction into society of private war; for the male relations of a wife would naturally, if at hand, be likely to resist her capture by the husband. The contention for the husband involves wholly untenable propositions. First, it involves that the husband may take possession of the wife's person by force, though no process of law could give him such possession of her. There never was any process of law for siezing and handing over the wife to the husband." * * *

"A husband has no such right at common law to the custody of his wife. It is inconceivable that the husband should be entitled to do by force for himself that which the law cannot enforce in his favor."

In *Fulgham v. State,* 46 Ala. 143, the rule is stated as follows:

"But in person, the wife is entitled to the same protection of the law that the husband can invoke for himself. She is a citizen of the state, and is entitled, in person and in property, to the fullest protection of the laws. Her sex does not degrade her below the rank of the highest in the commonwealth."

In *State v. Oliver,* 70 N. C. 44, it is said:

"We may assume that the old doctrine that a husband had a right to whip his wife, provided he used a switch no larger than his thumb, is not law in North Carolina. Indeed, the courts have advanced from that barbarism until they have reached the position that the husband has no right to chastise his wife under any circumstances."

Again, in *Buckingham v. Buckingham,* 81 Mich. 89, the same doctrine is declared:

"There would seem to be no legal principle which would prevent her from voluntarily deserting her husband, and abandoning her homestead. She is in no sense the slave of her husband, and is so far the master of her own will that she has liberty to remain with her husband, or go from him, as she pleases; and he has no legal remedy to compel her to return."

In *State v. Connolly,* 3 Ore. 69, the principle is stated as follows:

"If Mrs. Hill, the wife of the deceased, having reasonable ground to apprehend personal violence at the hands of her husband, sought a temporary refuge in the defendant's house, and the deceased, being forbidden, sought to enter, then either the defendant or his wife had a right to use all necessary force to prevent him from entering."

And in *Commonwealth v. McAfee,* 108 Mass. 459, we find a very clear and comprehensive statement of the rule:

"It may be stated, however, that under modern legislation, as well as judicial opinions, that fiction of legal unity

by .which the separate existence of the wife in a legal sense is denied is exploded.  Her person is as sacred as that of the husband, and the protection afforded by law to the one should not be denied to the other.  In fact, courts of equity have always recognized the separate existence of the wife in reference to her sole and separate estate, and to say that a court of law will recognize in the husband the power to compel his wife to obey his wishes, by force if necessary, is a relic of barbarism that has no place in an enlightened civilization."

Many additional authorities are cited to the same effect. Instruction No. 25 was as follows:

"No. 25.  You are instructed that there is no manslaughter in this case."

And again, instruction No. 26 contains the following:

"You are instructed that under the instructions in this case, and the evidence, you are at liberty to find the following verdicts:  Murder in the first degree; murder in the second degree, or not guilty."

Under the testimony, this was clearly material error. This subject was exhaustively discussed by Mr. Justice Gabbert in the recent case of *Henwood v. People,* decided at this term of court, and it is only necessary to cite this authority without a repetition of the argument.

Considering the testimony in this case in comparison with the circumstances there, we cannot escape the conclusion of error in the giving of these instructions.  This becomes more apparent when we consider the testimony offered by, the defendant and refused by the court.

In line with the court's theory as outlined in the instructions, testimony competent and vital to defendant's defense of self-defense, was refused and stricken out.  This line of testimony is sufficiently indicated by the statement of defendant's counsel as to what he desired to prove as follows:

"I want to show, prior to the night of the killing and since the marriage of the deceased to Mrs. Smith, the sister of the defendant, that there have been repeated and continued

acts of brutality on the part of the deceased; that these acts were made known and the results of them, to the defendant. That the deceased had made threats to take the life of both the sister of the defendant and the defendant himself; that on the day of July 15th, 1910, there was a fight, a row occurred in the house of Smith; at that time he jumped upon the abdomen of his wife and caused hemorrhages, which afterwards necessitated an operation. That Mrs. Smith left his house and fled to the house of the defendant for protection, as she had done oftentimes before; and I want to show that also, to show the state of mind that the defendant was in and the apprehension he might have as to the designs of the deceased."

And again:

"I want to ask questions of this witness, and other witnesses, which show the probability of whether or not Mr. Smith was the aggressor, and I want to ask this witness everything that Mrs. Smith would have been allowed to testify to were she the defendant, and what he knew of prior to the time of the shooting."

The court in the instructions and in the rejection of testimony offered, has overlooked the right of the brother to use such force as may be necessary for the protection of the person and life of his sister, as well as a consideration of the sudden passion that may be aroused in such a case.—*Campbell v. Commonwealth,* 88 Ky. 402.

The defendant complains and assigns as error the conduct of the deputy district attorney and the court. It is not necessary to go into detail in this matter, nor to especially consider it in that light, but some of the acts of both, in this regard were unusual, uncalled for, and manifestly unfair.

The refusal of the court to permit the defendant to show the general reputation of the deceased in the neighborhood in which he lived, as to being quarrelsome and dangerous, was worse than error. Considering the well known state of the law in this regard, this was inexcusable.

But still more grevious was, that after the court had rejected such testimony, it permitted the deputy district attorney to introduce testimony in rebuttal tending to show the reputation of the deceased in this respect, to be good. Citation of authorities as to these matters is not required.

Very much of the conduct of the deputy district attorney upon the trial was unfair, at least, if not reprehensible. For instance, he asked and was permitted to ask, questions of witnesses which by insinuation and innuendo, tended to reflect upon the moral character of the home of the defendant and high mother, when there was not a scintilla of testimony to justify these questions. This court in *Ritchey v. People, 23* Colo. 314, has approved Mr. Wharton's statement of the duty of a prosecuting attorney in the trial of criminal cases:

"It is scarcely necessary to add that a prosecuting attorney is a sworn officer of the government, required not merely to execute justice, but to preserve intact all the great sanctions of public law and liberty. No matter how guilty a defendant may in his opinion be, he is bound to see that no conviction shall take place except in strict conformity to law. It is the duty, indeed, of all counsel to repudiate chicanery and appeal to unworthy prejudice in the discharge of their high office; but eminently is this the case with public officers, elected as representing the people at large, and invested with the power which belongs to official rank, to comparative superiority in experience, and to the very presumption here spoken of that they are independent officers of state."

Particularly should this be his course of conduct in a case like this, where the defendant is in poverty and defended as a poor person. It is such conduct upon the part of officials, entrusted with power to enforce the law, as appears in this case, that breeds discontent, subjects courts to criticism and provokes contempt of the law.

The judgment is reversed and the case remanded.

Mr. JUSTICE MUSSER concurs.

Mr. JUSTICE GARRIGUES concurs i nthe reversal of the case upon the ground that the instructions were erroneous.